## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

RONALD BARROW,                     )
                                   )
            Plaintiff,             )
                                   )
vs.                                )        Case No. 3:14-CV-941-NJR-DGW
                                   )
WEXFORD HEALTH SOURCES, INC.,      )
DR. ERIC JOHNSON, DR. CHRISTINE    )
LOCHHEAD, DR. ROBERT               )
SHEARING, DR. MARK BAKER, and      )
WARDEN OF MENARD,                  )
                                   )
            Defendants.            )

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter is before the Court on Defendant Dr. Eric Johnson's motion for summary judgment (Doc. 284), Defendant Dr. Christine Lochhead's motion for summary judgment (Doc. 285), and Defendants Wexford Health Sources, Inc., Dr. Robert Shearing, and Dr. Mark Baker's motion for summary judgment (Doc. 286). For the reasons set forth below, Defendant Dr. Johnson's motion is denied, Defendant Dr. Lochhead's motion is granted, and Defendants Dr. Baker, Dr. Shearing, and Wexford's motion is denied.

### INTRODUCTION

Plaintiff Ronald Barrow, an inmate in the custody of the Illinois Department of Corrections ("IDOC"), filed this lawsuit *pro se* pursuant to 42 U.S.C. § 1983 alleging his constitutional rights were violated while he was incarcerated at Menard Correctional

Center. Barrow's allegations relate to ongoing medical treatment, or lack thereof, to address various eye conditions that have impaired his vision since 2012. Following the filing of an amended complaint and an order on motions for summary judgment on the issue of exhaustion of administrative remedies, Barrow is proceeding on a claim of deliberate indifference against Defendants Wexford Health Sources, Inc. ("Wexford"), Dr. Eric Johnson, Dr. Christine Lochhead, Dr. Robert Shearing, and Dr. Mark Baker. The Warden of Menard is named as a defendant only in an official capacity for purposes of securing injunctive relief, if necessary (*see* Docs. 1, 113, and 192).

Barrow timely responded to Defendants' motions for summary judgment (after requesting, and being granted, an extension of time to do so) (*see* Docs. 299, 300, 305, and 310-311). The Court, having carefully considered the briefs and all of the evidence submitted by the parties, finds as follows.

### FACTUAL BACKGROUND[1]

Barrow's claims in this matter relate to the medical care he received for various eye conditions from 2012 onward, causing him to lose vision in one or both eyes. Barrow's first eye examination relevant to this case occurred on January 10, 2012, when he saw Dr. Johnson, the onsite optometrist at Menard (Barrow's Deposition, Doc. 285-1, p. 4; Doc. 284-1, p. 85). Barrow contends that he began losing vision in his right eye in January 2012, and he told Dr. Johnson at his exam that he was seeing floaters in his right eye (Doc. 285-1, p. 4). Dr. Johnson checked Barrow's visual acuity, noting it was 20/20

---

[1] In setting forth the factual background, the Court chronicles the material facts underlying Barrow's claims as evidenced in the record before the Court. The Court notes that Barrow disputes a number of facts that Defendants presented. Although the Court declines to address each dispute, it will highlight genuine issues of material fact, as required by Federal Rule of Civil Procedure 56(a).

with correction in both eyes, and submitted an order for new eyeglasses for Barrow (Doc. 284-1, p. 85). Barrow asserts Dr. Johnson did not address his complaint of floaters at this examination (Doc. 299-1, p. 2, ¶ 4). Dr. Johnson contends there is no record that Barrow ever complained of floaters on this date. In support of this position, Dr. Johnson points to two letters written by Barrow, dated February 2 and February 21, 2012, which reference his examination on January 10, 2012, and complain about recent loss of eye sight in his right eye, but fail to include any reference to right eye floaters (although Dr. Johnson asserts he never received the letters, a fact that Barrow disputes) (Doc. 284-1, pp. 97-98). Barrow disputes that these letters support an inference that he failed to complain to Dr. Johnson about floaters. In any event, it is undisputed that floaters can signal a detachment, tear, or other problem involving the retina (Doc. 299-3, p. 4; Doc. 285-2, p. 16).

Soon after this examination, Barrow lost all vision in his right eye. He was seen on February 23, 2012, by Defendant Dr. Lochhead, another onsite optometrist at Menard (Doc. 285-1, p. 5). Based upon her examination, Dr. Lochhead referred Barrow for evaluation on an emergent basis by an outside physician for a possible right eye retinal detachment[2] (Affidavit of Dr. Christine Lochhead, Doc. 285-3, p. 2, ¶ 6; *see id.* at p. 10). The referral was approved, and Barrow was seen by Dr. Ahmad, an ophthalmologist at Marion Eye Center, on February 24, 2012 (Doc. 285-1, p. 6; Doc. 285-3, p. 2, ¶ 7). Dr. Ahmad determined Barrow had a detached retina in his right eye and performed

---

[2] In his motion, Dr. Johnson implies that Barrow's vision loss was due to a chemical agent splashing in Barrow's eye sometime after January 15, 2012; however, Barrow testified that Dr. Lochhead advised him it was not related to the chemical exposure (Doc. 285-1, p. 5).

surgery for a right eye retinal detachment on February 27, 2012 (*Id.*). Barrow saw Dr. Ahmed for a follow-up exam on March 17, 2012;[3] at that time, Dr. Ahmad explained that Barrow would need two additional procedures on his right eye: one to remove a cataract and one to remove scar tissue that had formed following surgery (Doc. 285-1, p. 7). Barrow saw Dr. Ahmad for another follow-up appointment on April 10, 2012 (Doc. 285-1, p. 8; Doc. 284-1, p. 86). Dr. Ahmad again recommended that Barrow undergo procedures to remove the cataract and scar tissue that developed following surgery on his right eye (Doc. 284-1, p. 92).

In light of this recommendation, Barrow's case was submitted by Dr. Johnson for collegial review with Defendants Dr. Baker and Dr. Shepherd (*Id.* at pp. 86 and 93). The cataract extraction was not approved because Barrow did "not meet criteria for cat extraction" (*Id.* at p. 93). There is no indication that Dr. Ahmad's recommended membrane peel to remove the scar tissue was brought forth by Dr. Johnson or considered by Dr. Baker or Dr. Shepherd during this review (*See id.*). Barrow was to see the onsite optometrist in two months and have his case re-presented if needed (*Id.*). Dr. Baker signed off on the decision as the "dedicated utilization management physician" (*Id.*). Dr. Baker attests that he and Dr. Shepherd came to their decision after discussing Barrow's best corrected visual acuity of 20/400 in his right eye and 20/25 in his left eye, as well as his ability to carry out his activities of daily living within the prison environment (Doc. 287-7, pp. 2-3, ¶ 11).

---

[3] It is not entirely clear when this examination took place. During his deposition, Barrow indicated he was seen by Dr. Ahmad on March 17, 2012; however, in his response to Dr. Johnson's motion, he indicates this examination took place on March 7, 2012 (*see* Doc. 299, p. 11). Although the Court notes this discrepancy, it finds that the precise date of this examination is not material to the issues in this case.

The parties do not dispute that Dr. Johnson examined Barrow again on June 19, 2012; however, the parties dispute most of what occurred at this appointment. Dr. Johnson asserts that he referred Barrow to an offsite ophthalmologist for right eye membrane stripping, but informed Barrow that Wexford would not approve a right eye cataract removal. Barrow contends that Dr. Johnson's documentation indicates the two removal procedures had not been approved (*See* Doc. 284-1, p. 87). Accordingly, Barrow disputes that there was a June 19, 2012 referral for evaluation of membrane stripping and cataract removal. Barrow also claims there are no documents concerning the collegial review of this purported referral, and Barrow was not seen until August 1, 2012 by Dr. Ahmad. Barrow's medical records, however, indicate that Barrow's case was presented in collegial review on June 27, 2012 (Doc. 287-2, p. 34). Dr. Baker attests that during this collegial review, it was determined that Barrow did not meet the criteria for cataract extraction; however, Barrow was approved for an outside examination by a retina specialist regarding the scar tissue in his right eye (Doc. 287-7, p. 3, ¶ 12).

Barrow also asserts that he sent a letter to Dr. Johnson dated July 24, 2012, wherein he complained about left-eye floaters that were impairing his ability to see (*See* Doc. 299-1, p. 5, ¶ 21; Doc. 284-1, pp. 57-58; Doc. 285-1, p. 8). Dr. Johnson denies ever receiving this letter (Doc. 284-1, p. 137). However, Barrow was seen by Dr. Ahmad on August 1, 2012 (Doc. 287-2, pp. 35-41). Dr. Ahmad diagnosed Barrow with a retinal tear in his left eye that was repaired on the date of his appointment (*Id.*; Doc. 285-1, p. 9). Dr. Ahmad also advised Barrow again of the "macular puckering" in his right eye and explained that the longer the scar tissue remains on Barrow's eye, the less his vision

would improve if surgery was completed (Doc. 287-2, p. 40; Doc. 285-1, p. 9). Barrow's medical records also indicate that Dr. Ahmad diagnosed Barrow with a "severe NS and PSC cataract" in his right eye and indicated he would have some vision improvement if the cataract were removed (Doc. 287-2, p. 39).

After his appointment with Dr. Ahmad, Barrow saw Dr. Johnson for a follow-up exam (Doc. 285-1, p. 10; Doc. 284-1, p. 88). Barrow asserts Dr. Johnson informed him Wexford policy did not allow him to undergo the removal procedures recommended by Dr. Ahmad (Doc. 285-1, p. 10). Dr. Johnson asserts that he referred Barrow for a right eye pars plana vitrectomy (a procedure to remove vitreous gel from the eye) and a three-month follow-up for the retinal tear in Barrow's left eye (Doc. 284-1, p. 88). It is not clear why Dr. Johnson did not refer Barrow for removal of his cataract and scar tissue based on Dr. Ahmed's recommendations. Barrow did not undergo any further examinations by Dr. Johnson relevant to this lawsuit.

Dr. Johnson's referral for a pars plana vitrectomy ("PPV") was approved by Dr. Baker and Dr. Shah (not a named defendant) during collegial review on August 13, 2012 (Doc. 287-2, p. 43; Doc. 287-7, p. 3, ¶ 13). Barrow was referred to Dr. Ahmad on October 31, 2012 for another examination (Doc. 285-1, p. 10). At this appointment, Dr. Ahmad examined Barrow's left and right eye and again recommended procedures for the removal of his right eye cataract and scar tissue; however, he indicated that he had not received approval to complete these procedures (*Id.*).

On this same date, Dr. Lochhead submitted a referral for Barrow to undergo removal procedures for his right eye cataract and scar tissue (Doc. 285-1, p. 10;

Doc. 285-2, p. 19; *see* Doc. 287-2, p. 44). In her referral, Dr. Lochhead indicates that the procedures might improve Barrow's visual acuity in his right eye to 20/60, but that the membrane peel alone would only improve his visual acuity to 20/200 (this referral appears to have been handled as an appeal of the April 18, 2012 denial of a referral for extraction of Barrow's right eye cataract) (Doc. 285-3, p. 3, ¶ 12; *see* Doc. 287-2, p. 44). On November 6, 2012, Dr. Lochhead's request for a referral was denied by Dr. Baker, in consultation with Dr. Shepherd (Doc. 285-3, p. 3, ¶ 13; Doc. 287-2, p. 46). This decision was made after discussing Barrow's best correct visual acuity of 20/400 in his right eye and 20/20 in his left eye and his ability to carry out his activities of daily living (Doc. 287-7, pp. 3-4, ¶ 14; Doc. 287-2, p. 46). According to Dr. Baker, Wexford's policy for the management of cataracts allows for approval of cataract surgery if the inmate's best corrected visual acuity is 20/60 or worse in the dominant eye, or if the cataract causes inflammation, angle closure, or medically unmanageable open angle glaucoma (Doc. 287-7, p. 4, ¶ 15). Defendant Baker asserts that these conditions were not present in Barrow's case on April 18, 2012 (though he fails to assert whether these conditions were present on November 6, 2012) (*Id.*). At her deposition, Dr. Lochhead testified that no test was done to determine Barrow's dominant eye due to the retinal detachment (Doc. 285-2, pp. 6, 19). In other words, Dr. Lochhead explained that "[i]t would be impossible to evaluate which of his eyes were dominant with one of them so severely damaged" (*Id.* at p. 19). Significantly, there is no documentation regarding the disapproval of the scar tissue removal.

Barrow continued to see Dr. Lochhead for regular eye exams from October 31, 2012, to December 26, 2013 (Doc. 285-3, pp. 3-4, ¶ ¶ 14-18; *see* Doc. 287-3, pp. 8-12). Barrow testified at his deposition that he had no complaints regarding the treatment provided by Dr. Lochhead during this time, aside from the fact that she was bound to follow Wexford's decision regarding the recommended removal procedures.

When Barrow saw Dr. Lochhead for an examination on December 26, 2013 (Doc. 287-3, p. 11), he complained of worsening vision in his left eye. After performing an examination, Dr. Lochhead determined that Barrow's vision in his left eye was 20/70. Based on this finding, Dr. Lochhead concluded that Barrow met the criteria for cataract removal and submitted a referral for Barrow to be seen for an evaluation for cataract extraction (Doc. 285-2, p. 13; Doc. 285-3, p. 4, ¶ 18; *see* Docs. 287-2, p. 47 and 287-3, p. 12). On January 13, 2014, Dr. Lochhead's referral was approved by Dr. Garcia, and Barrow was sent to Dr. Unwin at Illinois Eye Surgeons on March 5, 2014 (Doc. 287-2, pp. 48-52). Dr. Unwin recommended Barrow see a retinal specialist after which he would perform cataract surgery (Doc. 285-1, p. 12; Doc. 285-3, p. 4, ¶ 20; *see* Doc. 285-3, p. 25).

Subsequently, on April 4, 2014, Dr. Lochhead submitted a referral for Barrow to see Dr. Tarigopula at Illinois Eye Surgeons for a retinal consultation prior to cataract surgery (Doc. 285-3, p. 5, ¶ 22). This referral was approved on April 21, 2014, and Barrow was seen by Dr. Tarigopula on May 16, 2014 (Doc. 287-2, pp. 53-56). Dr. Tarigopula was unable to evaluate the scar tissue on Barrow's right eye due to the thickness of his right eye cataract. Dr. Tarigopula recommended that Barrow undergo a procedure to remove his right eye cataract before having his scar tissue evaluated (Doc. 285-1, p. 12).

Dr. Tarigopula also noted that Barrow had a cataract in his left eye (Doc. 285-1, p. 12; *see* Doc. 287-2, p. 54).

On June 9, 2014, Barrow was approved to undergo a removal procedure for his right eye cataract by Drs. Fisher and Trost (Doc. 287-2, p. 57). Following some confusion regarding which eye the cataract would be removed from (the left eye or the right eye), Barrow's right eye cataract was removed on June 26, 2014 (Doc. 285-1, p. 13; *see* Doc. 287-2, pp. 23-24). Barrow was seen by Dr. Lochhead for follow-up appointments on June 27 and July 3, 2014 (Doc. 285-1, p. 13; *see* Doc. 285-3, pp. 35, 37). By the July 3, 2014 examination, some vision had returned in Barrow's right eye (Doc. 285-1, p. 13). Barrow was scheduled to be seen by site optometry on July 17 and August 8, 2014, but the appointments were cancelled because the facility was on deadlock (Doc. 285-3, p. 5, ¶ 27; *see* pp. 38-39). On August 8, 2014, Dr. Lochhead did, however, submit a referral for Barrow to again see Dr. Tarigopula for a consultation for a membrane peel on his right eye (Doc. 285-1, p. 14; Doc. 285-3, pp. 6, 40). Defendant's referral was purportedly approved on August 14, 2014 (Doc. 285-1, p. 14).

Barrow was seen by Dr. Unwin on September 9, 2014, at Quantum Vision Center (Doc. 287-3, pp. 15-19). At this appointment, Barrow complained of blurred vision in both of his eyes, but indicated that the vision in his right eye was improving since his cataract extraction (Doc. 287-3, p. 16). Barrow's visual acuity was documented as 20/40 in his right eye and 20/50 in his left eye (Doc. 287-3, p. 17). Barrow saw Dr. Tarigopula on September 19, 2014, during which time she again confirmed the need for a membrane peel and indicated she would recommend the procedure (Doc. 287-3, pp. 29-33). Based

on Dr. Tarigopula's recommendation, Dr. Lochhead submitted a referral for Barrow to undergo a right eye pars plana vitrectomy and membrane peel (Doc. 285-3, p. 6, ¶ 31; *see* Doc. 287-3, p. 34). Barrow underwent these procedures on October 14, 2014 (Doc. 285-1, p. 15; Doc. 285-3, p. 6, ¶ 32; *see* Doc. 287-3, pp. 35-38).

Barrow saw Dr. Tarigopula for a follow-up examination on October 15, 2014 (Doc. 287-3, pp. 39-41). On October 21, 2014, Barrow saw Dr. Lochhead complaining about pain in his right eye (Doc. 285-1, p. 16; *see* Doc. 285-3, p. 50). Defendant Lochhead recommended that Barrow follow-up with a retinal specialist in two days and return to site optometry the following week (Doc. 285-3, p. 6, ¶ 32, *see* Doc. 285-3, p. 50). In accordance with Dr. Lochhead's recommendation, Barrow saw Dr. Tarigopula on October 23, 2014 (Doc. 285-1, p. 16; Doc. 285-3, p. 7, ¶ 33). According to Barrow, Dr. Tarigopula was concerned about some bleeding in his right eye, and she was surprised that Barrow had not been supplied the eye drops she prescribed on October 18, 2014 (Doc. 285-1, p. 16). Dr. Tarigopula recommended that Barrow come in for a follow-up exam in one month (Doc. 285-3, p. 7, ¶ 33). Dr. Lochhead put in a referral based on this recommendation that was apparently approved, as Barrow saw Dr. Tarigopula again on November 13, 2014 (Doc. 285-3, p. 7, ¶ 34; *see* Doc. 285-3, p. 52). Barrow testified that Dr. Tarigopula informed him that he had scar tissue on the cataract lens in his right eye at the November 13, 2014 examination (Doc. 285-1, p. 17).

Barrow saw Dr. Lochhead again on November 20, 2014, who noted his right eye visual acuity was 20/50, and his left eye visual acuity was 20/30 (Doc. 285-3, p. 7, ¶ 36; *see* Doc. 287-3, p. 46). Dr. Lochhead recommended that Barrow follow up again in two

weeks (*Id.*). In accordance with this recommendation, Barrow saw Dr. Lochhead on December 4, 2014 (Doc. 285-3, p. 7, ¶ 37; *see* Doc. 287-3, p. 47). At this examination, Barrow's visual acuity was 20/50 in his left eye and 20/40 in his right eye (*Id.*). It was recommended that Barrow follow up in three months with site optometry (*Id.*). Barrow testified at his deposition that Dr. Lochhead was consistent in scheduling Barrow for follow-up visits, as set forth above (Doc. 285-1, p. 31).

On January 9, 2015, Dr. Lochhead submitted a referral for Barrow to present to Quantum Vision Center for a follow-up examination; however, there is no record regarding a review of this referral (Doc. 285-3, p. 7, ¶ 38; *see* Doc. 285-3, p. 56). Dr. Lochhead submitted another referral on January 28, 2015, for an evaluation by Dr. Unwin for a yag capsulotomy eye procedure to address a decrease in visual acuity (Doc. 285-3, p. 8, ¶ 39; Doc. 285-3, p. 57). It is not clear what Barrow's visual acuity was at this time or whether the noted decrease in his visual acuity was based on a previous finding or new information. In any event, Barrow asserts that he presented at Quantum Vision Center on April 8, 2015 for the yag procedure, but was told that it had not been approved and, as such, it would not be completed (Doc. 285-1, p. 17). Barrow underwent the yag procedure on June 25, 2015 (Doc. 285-1, p. 17; *see* Doc. 287-3, pp. 54-58). This was the last time Barrow was seen by an outside ophthalmology provider (Doc. 285-1, p. 19). The Wexford Defendants assert that on July 2, 2015, soon after the yag procedure was performed, Barrow's best corrected vision was 20/30 in his right eye and 20/50 in his left eye and, on October 22, 2015, it was 20/50-1 in the right eye and 20/40-20/50 in the left eye (*see* Docs. 287-3, pp. 50-51).

## Summary Judgment

Summary judgment is proper only if the moving party can demonstrate that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); s*ee also Ruffin Thompkins v. Experian Information Solutions, Inc.*, 422 F.3d 603, 607 (7th Cir. 2005); *Black Agents & Brokers Agency, Inc. v. Near North Ins. Brokerage, Inc.*, 409 F.3d 833, 836 (7th Cir. 2005). The moving party bears the burden of establishing that no material facts are in genuine dispute; any doubt as to the existence of a genuine issue must be resolved against the moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970); *see also Lawrence v. Kenosha Cty.*, 391 F.3d 837, 841 (7th Cir. 2004).

A moving party is entitled to judgment as a matter of law where the non-moving party "has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof." *Celotex*, 477 U.S. at 323. "[A] complete failure of proof concerning an essential element of a nonmoving party's case necessarily renders all other facts immaterial." *Id*. The Seventh Circuit has stated that summary judgment is "the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Steen v. Myers*, 486 F.3d 1017, 1022 (7th Cir. 2007) (quoting *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (other citations omitted)).

## Eighth Amendment Deliberate Indifference

The Supreme Court has recognized that "deliberate indifference to serious

medical needs of prisoners" may constitute cruel and unusual punishment under the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to prevail on this claim, Barrow must show first that his condition was "objectively, sufficiently serious" and second, that the "prison officials acted with a sufficiently culpable state of mind." *Greeno v. Daley*, 414 F.3d 645, 652-53 (7th Cir. 2005) (citations and quotation marks omitted).

With regard to the first showing, the following circumstances could constitute a serious medical need: "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Hayes v. Snyder*, 546 F.3d 516, 522-23 (7th Cir. 2008) (quoting *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997)); *see also Foelker v. Outagamie Cnty.*, 394 F.3d 510, 512-13 (7th Cir. 2005) ("A serious medical need is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.").

A prisoner also must show that prison officials acted with a sufficiently culpable state of mind, namely, deliberate indifference. "Deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain.'" *Estelle*, 429 U.S. at 104 (quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976)). "The infliction of suffering on prisoners can be found to violate the Eighth Amendment only if that infliction is either deliberate, or reckless in the criminal law sense." *Duckworth v. Franzen*, 780 F.2d 645, 652-53 (7th Cir. 1985). Negligence, gross negligence, or even recklessness as

that term is used in tort cases, is not enough. *Id.* at 653; *Shockley v. Jones*, 823, F.2d 1068, 1072 (7th Cir. 1987). Put another way, a plaintiff must demonstrate that the officials were "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and that the officials actually drew that inference. *Greeno*, 414 F.3d at 653. A plaintiff does not have to prove that his complaints were "literally ignored," but only that "the defendants' responses were so plainly inappropriate as to permit the inference that the defendants intentionally or recklessly disregarded his needs." *Hayes*, 546 F.3d at 524 (quoting *Sherrod v. Lingle*, 223 F.3d 605, 611 (7th Cir. 2000)).

### DISCUSSION

Defendants Dr. Johnson, Dr. Lochhead, Dr. Baker, Dr. Shepherd, and Wexford all assert they are entitled to judgment as a matter of law. Notably, Defendants do not contend that Barrow's eye conditions fail to meet the objective requirement of a "serious medical need" as explained above. Thus, the Court finds that element has been conceded and considers only whether Defendants were deliberately indifferent. The Court considers each Defendant's argument in turn, as set forth below.

### A.    Dr. Eric Johnson

Dr. Johnson contends that summary judgment in his favor is appropriate as he repeatedly provided treatment to Barrow that met the applicable standard of care. Dr. Johnson claims there is no evidence that he inflicted cruel and unusual punishment on Barrow. In support of his motion, Dr. Johnson makes three primary arguments. First, he asserts there is no evidence Barrow complained of floaters during his January 10, 2012 examination. Second, Dr. Johnson contends he appropriately evaluated, monitored, and

treated Barrow's eye conditions on the four occasions he saw Barrow between January 10, 2012, and August 1, 2012. Finally, Dr. Johnson asserts Barrow has failed to provide any evidence that his conduct caused the constitutional deprivations of which Barrow complains.

Dr. Johnson's arguments miss the mark. With regard to his first point, Barrow has produced sufficient evidence to create a genuine issue of fact as to whether he complained about floaters to Dr. Johnson at the January 10, 2012 examination. This fact is material to the question of whether Dr. Johnson acted appropriately and with adequate care in rendering treatment for Barrow's eye conditions, as it is undisputed that floaters can signal a detachment, tear, or other problem in involving the retina.

Dr. Johnson is correct that "[a] prisoner's dissatisfaction with a doctor's prescribed course of treatment does not give rise to a constitutional claim unless the medical treatment is so blatantly inappropriate as to evidence intentional mistreatment likely to seriously aggravate the prisoner's condition." *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996) (quotation omitted). However, this Circuit also recognizes that a physician, in exercising his or her professional judgment, must make decisions that are "fact-based with respect to the particular inmate, the severity and stage of his condition, the likelihood and imminence of further harm, and the efficacy of available treatments." *Roe v. Elyea*, 631 F.3d 843, 860 (7th Cir. 2011) (citing *Collingon v. Milwaukee Cty.*, 163 F.3d 982, 989 (7th Cir. 1998) ("A plaintiff can show that the professional disregarded the need only if the professional's subjective response was so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional

would have so responded under those circumstances.")).

When viewing the evidence before the Court in the light most favorable to Barrow, the Court finds there is a question of fact as to whether Dr. Johnson exercised his professional judgment in addressing Barrow's complaints of floaters and rendering adequate treatment for his eye conditions. In particular, there is evidence that Barrow complained of floaters at his eye appointment on January 10, 2012, and again by way of letter on July 24, 2012, but Dr. Johnson failed to address these complaints. Significantly, soon after Barrow lodged his complaints to Dr. Johnson, he was diagnosed with either a detached or torn retina (first in his right eye and then in his left eye). The temporal proximity of Barrow's complaints regarding floaters and a subsequent finding of retinal issues creates a question of fact as to whether Dr. Johnson was deliberately indifferent in failing to adequately evaluate Barrow's complaints. Accordingly, Dr. Johnson is not entitled to judgment as a matter of law.

**B.      Dr. Christine Lochhead**

Dr. Lochhead seeks judgment in her favor arguing there is no evidence that her regular evaluation and treatment of Barrow's eye conditions, coupled with her many referrals for Barrow to see outside specialists for additional care, equates with an unnecessary, wanton infliction of pain or a reckless disregard of Barrow's vision needs. The Court agrees.

Although Barrow disputes much of Dr. Lochhead's statement of facts, most of the disputes are not material to the issue of whether Dr. Lochhead acted with deliberate indifference in her treatment of Barrow's eye conditions. Indeed, most of Barrow's

complaints attributable to Dr. Lochhead relate to matters outside of her control, including approval of various referrals to outside specialists, lapses in the provision of prescription medications that she had prescribed, scheduling of appointments, and care attributable to other on-site providers. Accordingly, the Court declines to reference each dispute mentioned by Barrow. In any event, the material facts, when viewed in Barrow's favor, establish that Dr. Lochhead not only saw and examined Barrow regularly, but consistently referred Barrow for additional consultation and procedures with outside providers. While Dr. Lochhead's referrals were not always approved by the utilization review committee, these matters were outside her control.

Although Barrow clearly disagrees with Dr. Lochhead's course of treatment and apparently was frustrated by the delays in receiving approval for various procedures, as noted above, it is well established that his mere dissatisfaction with a prescribed course of treatment does not equal a constitutional claim unless the treatment was "blatantly inappropriate." *Snipes*, 95 F.3d at 592. Making such a showing is not easy as "[a] medical professional is entitled to deference in treatment decisions unless 'no minimally competent professional would have so responded under those circumstances.'" *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014) (quoting *Sain v Wood*, 512 F.3d 886, 894-95 (7th Cir. 2008) (other quotation omitted)). In other words, federal courts will not interfere with a doctor's decision to pursue a particular course of treatment unless that decision represents so significant a departure from accepted professional standards or practices that it calls into question whether the doctor actually was exercising his professional judgment. *Id.* (citations omitted).

There is no evidence that Dr. Lochhead's prescribed course of treatment was "blatantly inappropriate." Rather, the evidence demonstrates that Dr. Lochhead examined Barrow multiple times and referred Barrow for a variety of procedures on multiple occasions. Although the referrals were not always approved, the record fails to demonstrate that any delay was attributable to Dr. Lochhead. Accordingly, the Court finds that Dr. Lochhead's treatment of Barrow was grounded in professional judgment and was reasonable. *See Jackson v. Kotter*, 541 F.3d 688, 698 (7th Cir. 2008). For the reasons mentioned above, Dr. Lochhead is entitled to judgment as a matter of law.

### C.    Dr. Mark Baker

Dr. Baker seeks summary judgment on Barrow's deliberate indifference claim, asserting that Barrow received immediate evaluation and treatment for urgent ophthalmologic conditions and was never denied care.

With regard to Dr. Baker, the evidence viewed in Barrow's favor establishes that this Dr. Baker was the Strategic Clinical Initiatives Director for Wexford from August 29, 2011, to July 3, 2013, and, in this role, conducted Wexford's utilization management process meetings known as "collegial review" via telephone with on-site correctional facility medical directors (Doc. 287-7, p. 1, ¶¶ 2, 4). With regard to Barrow in particular, Dr. Baker received a number of referrals from Menard's on-site optometrists. Specifically, Dr. Baker was involved in the following referral reviews:

- April 18, 2012 non-approval for a request that Barrow be seen by an outside ophthalmologist for evaluation of a right eye cataract and scar tissue removal;

- June 27, 2012 non-approval for a request that Barrow be evaluated for a

right eye cataract and an approval for evaluation by a retinal specialist regarding right eye scar tissue;

- August 13, 2012 approval for Barrow to undergo a pars plana vitrectomy of the right eye following a specialist's recommendation; and

- November 6, 2012 denial of an appeal of the April 18, 2012 non-approval for evaluation of Barrow's right eye cataract and scar tissue removal.

Dr. Baker attests that the decisions disapproving referrals for Barrow to undergo evaluation for right eye cataract extraction and/or scar tissue removal on April 18, 2012, June 27, 2012, and November 6, 2012, were based on Barrow's "near normal visual acuity in his left eye" and his "ability to safely perform his activities of daily living," which led to a finding that Barrow did not meet the criteria for cataract extraction. Dr. Baker asserts that these decisions comport with Wexford's policy for the management of cataracts that allows for surgery if the inmate's best corrected visual acuity is 20/60 or worse in the dominant eye, or if the cataract causes inflammation, angle closure, or medically unmanageable open angle glaucoma. In this instance, Dr. Baker noted that Barrow's best corrected visual acuity was 20/400 in his right eye and 20/25 in his left eye.

In light of this evidence, Dr. Baker's argument that Barrow received immediate evaluation and treatment for urgent ophthalmologic conditions and was never denied care is problematic. Most certainly, Dr. Baker denied Barrow surgical treatment and outside evaluation for his right eye cataract and right eye scar tissue on multiple occasions. Although Dr. Baker cites Wexford policy to support this decision, there is a question of fact as to whether this denial was appropriate and whether it was based on

an analysis of the severity and stage of Barrow's condition, the likelihood and imminence of further harm, and the efficacy of available treatments. *See Roe*, 631 F.3d at 860. Indeed, on the utilization review forms completed and signed by Dr. Baker, there is no mention of the analysis undertaken to deny Barrow's referral. At most, the only reason provided was that Barrow "does not meet criteria for cat extraction." The Court cannot discern how this is the case, because Wexford policy appears to require a determination as to which eye is the patient's dominant eye and, as testified by Dr. Lochhead, no test could ascertain Barrow's dominant eye due to his severe eye damage. Furthermore, the record is bereft of any evidence that Dr. Baker considered, and rendered his professional judgment, in denying Barrow's referral for outside evaluation and surgical removal of scar tissue present in his right eye.

For these reasons, a reasonable jury could find that Dr. Baker's repeated denial of the on-site optometrists' referrals for right eye cataract extraction and scar tissue removal were not clearly within boundaries of accepted professional standards or based on the exercise of professional judgment. *See Pyles*, 771 F.3d at 409 (citations omitted). Accordingly, the Court finds there is a question of fact as to whether Dr. Baker was deliberately indifferent, and he is not entitled to judgment as a matter of law.

### D.     Dr. Robert Shearing

Similar to Dr. Baker, Dr. Shearing seeks summary judgment on Barrow's deliberate indifference claim on the basis that Barrow received immediate evaluation and treatment for urgent ophthalmologic conditions and was never denied care.

The Court's findings with regard to Dr. Baker are similar to its findings with

regard to Dr. Shearing. More specifically, the evidence viewed in Barrow's favor establishes that Dr. Shearing engaged in collegial review with Dr. Baker on April 18, 2012, June 27, 2012, and November 6, 2012, and denied referrals for Barrow to undergo a procedure for removal of his right eye cataract and scar tissue.

As set forth above regarding Dr. Baker, there is a similar question of fact as to whether Dr. Shearing exercised his professional judgment in denying Barrow these procedures and relying on Wexford's cataract removal policy. Dr. Shearing, therefore, is not entitled to judgment as a matter of law.

### E. Wexford Health Sources, Inc.

Barrow's deliberate indifference claim against Defendant Wexford is premised on its alleged utilization of a "one good eye" policy and adoption of practices resulting in a prioritization of "cost over care."

As articulated by the Seventh Circuit, where a private corporation has contracted to provide essential government services, such as health care for prisoners, the private corporation cannot be held liable under § 1983 unless the constitutional violation was caused by an unconstitutional policy or custom of the corporation itself. *Shields v. Illinois Dep't of Corr.*, 746 F.3d 782, 789 (7th Cir. 2014); *see also Monell v. Dep't of Social Servs. of City of New York*, 436 U.S. 658 (1978). Accordingly, in order for Barrow to recover from Wexford, he must offer evidence that his injury was caused by a Wexford policy, custom, or practice of deliberate indifference to medical needs, or a series of bad acts that together raise the inference of such a policy. *Id.* at 796. Also, Barrow must show that policymakers were aware of the risk created by the custom or practice and must have

failed to take appropriate steps to protect him. *Thomas v. Cook Cty. Sheriff's Dept.*, 604 F.3d 293, 303 (7th Cir. 2009).

Wexford contends that it is entitled to judgment as a matter of law on Barrow's deliberate indifference claim because Barrow has failed to prove the existence of a policy or custom that inflicted an injury on Barrow. More specifically, Wexford asserts that money is never a consideration in regards to providing medical care, and its policy on the management of cataracts is merely a guide for providers to determine when an inmate could be referred for cataract extraction and is not intended to replace providers' clinical judgment. As the Court finds insufficient evidence in the record to establish that Barrow's care (or lack thereof) was driven by profit motives or "cost over care," it declines to engage in a protracted analysis on this issue. The Court takes a careful look at Barrow's allegations regarding a "one eye policy," however, based on the evidence in the record.

The evidence before the Court indicates that Wexford's policy regarding cataract removal allows for approval of cataract surgery if the inmate's best corrected visual acuity is 20/60 or worse in the dominant eye, or if the cataract causes inflammation, angle closure, or medically unmanageable open angle glaucoma (Doc. 287-7, p. 4, ¶ 15). This statement of the Wexford policy, attested to by Dr. Baker, appears to be an accurate recitation of the undated written policy that describes Wexford's position as follows:

- Consideration of cataract surgery is indicated when maximally corrected binocular Snellen visual acuity is 20/60 or worse in the dominant eye and such surgery offers a reasonable likelihood in visual function;

- Consideration of cataract surgery is indicated when the lens opacity

inhibits optimal management of posterior segment ocular disease or the lens causes inflammation, angle closure, or medically unmanageable open-angle glaucoma (Doc. 307-4, pp. 2-3, sealed).

A plain reading of this policy would allow Wexford to deny an inmate cataract surgery so long as they have adequate (20/60) vision in their dominant eye, without regard to the visual acuity of the other, cataract-affected eye (with some exceptions provided for particular circumstances, as set forth above). Although Wexford takes issue with Barrow's designation of this policy as the "one good eye" policy, this description is not unfounded. The Court finds adequate evidence in the record that Wexford's subscription to this policy caused Barrow injury in that he was made to wait approximately 27 months for removal of his right eye cataract due to this policy (and, as a result, was unable to clearly see out of his eye for this amount of time). Because of the obviousness of this circumstance, the Court further finds that Wexford knew or should have known of the risk created by its policy, but failed to take appropriate steps to protect Barrow. For these reasons, the Court finds that Defendant Wexford failed to meet its burden in showing that it is entitled to judgment as a matter of law. Accordingly, Barrow's deliberate indifference claim against Defendant Wexford shall proceed.

## CONCLUSION

For the reasons set forth above, Defendant Dr. Eric Johnson's motion for summary judgment (Doc. 284) is **DENIED**; Defendant Dr. Christine Lochhead's motion for summary judgment (Doc. 285) is **GRANTED**; and Defendant Wexford Health Sources, Inc., Dr. Robert Shearing, and Dr. Mark Baker's motion for summary judgment

(Doc. 286) is **DENIED**. Defendant Dr. Christine Lochhead is **DISMISSED with prejudice**.

Barrow shall proceed in this action on his claim of deliberate indifference against Defendants Dr. Johnson, Dr. Baker, Dr. Shearing, and Wexford. The Warden of Menard remains a defendant for purposes of injunctive relief.

**IT IS SO ORDERED.**

**DATED:   May 5, 2017**

s/Nancy J. Rosenstengel_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**